### UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

Case Number: 20-3836 (reo)

Case Name: Frank Dundee v. Danialle Lynce, et al

Name: Frank Dominic Dundee

Address: 7707 Amberwood Trail          City: Boardman          State: Ohio

Zip Code: 44512

### PRO SE APPELLANT'S REPLY BRIEF*

The Pro Se Appellant apologizes for the form of this reply brief if it is not in compliance with Sixth Circuit guidelines. For at least the last nine months there has been no guidance posted on the Sixth Circuit website: *Filing Without Attorney Information for Pro Se Litigants* *Pro Se Information Document (Document is currently not available.)*

### Introduction

Charles Dickens, in his story "A Christmas Carol," opens by informing the reader, "Marley was dead: to begin with...There is no doubt that Marley was dead. This must be distinctly understood, or nothing wonderful can come of the story I am going to relate." The Appellant, likewise, opens his Reply Brief by noting that two cases settled in the Sixth Circuit, Kroll v. White Lake Ambulance Auth., No. 13-1774 (6th Cir. 2014), and Hubbell v. Fedex Smartpost, Inc., ___ F.3d ___; 2019 WL 354786 (Aug. 5, 2019), are essential to proving that "University Hospitals broke the law: to begin with...There is no doubt that University Hospitals broke the law. This must be distinctly understood, or nothing resembling justice can come of the story I am going to relate."

1

The Defendant(s) blatantly and egregiously ignored an employer's obligations under Title VII and Title I of the ADA, even after being warned, repeatedly, that they were breaking the law.  For this reason University Hospitals should be sanctioned by the Court with the highest compensatory and punitive damages in EEO law for a corporation with greater than 500 employees: $300,000 for each of the three violations cited by the Plaintiff, as well as any penalties that the Court might determine.  Failure to hold University Hospitals accountable in this case will no doubt reverberate throughout the work-lives of its 28,000 employees for years to come.

The Appellant is cognizant that his efforts to "cover" all alternatives in court submissions does not assist the Court.  The litigant is employing strategical discretion throughout this Reply Brief, trying to balance being an effective advocate and yet avoiding tasking the court with a mountain of information and forcing the court to pick his best arguments.  However, the unlawful actions of the Defendant(s) were committed over a period of years and those violations were scrupulously documented by the Plaintiff.  A thorough examination of the Plaintiff's contemporaneous, documentary evidence by the Sixth Circuit is essential to proving the unlawful actions in the charge before the Court.

### De Novo Review

Unfortunately, many issues are not easily labeled as questions of law, fact, or discretionary rulings.  The Appellant's argument for de novo review is based on mixed questions of law, fact and possibly implicit bias.   Courts and advocates alike have struggled over the years with defining the appropriate standard of review for issues that present mixed questions of law and fact, examples of which are presented in this appeal.

The appellate court hearing the Plaintiff's case *de novo* may refer to the lower

court's record to determine the facts, but should rule on the evidence and matters of law

without deferring to that court's findings.  The Supreme Court has defined mixed

questions as those in which "the historical facts are admitted or established, the rule of

law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or

constitutional] standard, or to put it another way, whether the rule of law as applied to the

established facts is or is not violated.  The Appellant is confident that the Sixth Circuit

will view his request for de novo review in this light.

There is some comfort for the Appellant in knowing that even without the requisite

record, the Sixth Circuit still has the option to review an argument in exceptional

circumstances. S*ee, e.g., Maldonado Investments, L.L.C., on behalf of Olive St. Bistro v.

State Farm Fire & Cas. Co.*, 715 F. App'x 359, 362 (5th Cir. 2017) ("To invoke a

miscarriage of justice, we have required litigants to show good cause for their failure to

raise an issue below or identify a unique harm making the result manifestly unfair absent

their ability to press an issue on appeal."); *United States v. Chesney*, 86 F.3d 564, 567-68

(6th Cir. 1996) (Court may review an issue not raised below in exceptional circumstances

or when application of the rule against considering new issues on appeal would result in a

miscarriage of justice).

### The McDonnell Douglas Test

The first step of the framework under McDonnel Douglas requires that an employee

establish a prima facie case of discrimination. A prima facie case means that the basic

requirements of the cause of action have been met. To pass this step, the employee only must only provide enough evidence to create a presumption of illegal discrimination. In the second step, the burden shifts to the employer, which must show that what the employee claims was a discriminatory act was in fact nondiscriminatory and legally allowed. Assuming the employer passes the second step, the burden shifts back to the employee for the third step.

In step three, the employee must present additional evidence to challenge the employer's claimed legal and nondiscriminatory action. To do this, the employee must either show that the employer's actions were a pretext for illegal discrimination or provide additional evidence of the employer's discriminatory motive. A pretext being the made-up justification to conceal the real and improper reason for an action.

The Appellant not only  raised and exposed the issue of pretext in document #1 and #31 of his filings in Case# 1:19-cv-01141-DAP, but also in document #48, his Objection to The Report and Recommendation, which serves as his Appellant Brief to the Sixth Circuit.  In _Reeves v. Sanderson Plumbing Products, Inc._, the Court emphasized that "a plaintiff's prima facie case of age discrimination, combined with sufficient evidence to find that the employer's asserted justification for its action was false, may permit the trier of fact to conclude that the employer unlawfully discriminated," and that the plaintiff need not always introduce additional and independent evidence of discrimination.

The Appellant has submitted extensive timely and accurate contemporaneous notes and emails that demonstrate the employer, University Hospitals (UH), justification for its actions against Frank Dundee was false and pretextual, permitting the Court to conclude that UH unlawfully discriminated.

4

The belief that a plaintiff must satisfy the factors of the McDonnell Douglas method in every discrimination case that has no direct evidence results in an elevated evidentiary standard for a plaintiff in a discrimination case to overcome as compared to plaintiffs in other types of actions, such as tort actions. The Plaintiff, Frank Dundee, in the discrimination claim is required to establish the McDonnell Douglas factors and then, if the employer meets its burden, also establish discrimination through the traditional methods of proof.  Even though McDonnell Douglas is an option to the Plaintiff, Dundee, the plaintiff may alternatively forego McDonnell Douglas and simply attempt to prove illegal discrimination under the ordinary standards of proof.

The Appellant is confident that the contemporaneous evidence he presents both meets the McDonnell Douglas test, but also meets the proof that UH illegally discriminated under ordinary standards of proof under retaliation.

Application of McDonnell Douglas to retaliation claims in the workplace are protected from an employer's discriminatory actions by such federal employment discrimination protection statutes as Title VII of the 1964 Civil Rights Act (Title VII), the Americans with Disabilities Act (ADA), and the Age Discrimination in Employment Act (ADEA).  For this protection to be effective, employees must feel comfortable to come forward and report the discrimination and not fear repercussions from their employer for reporting the discrimination. Employee decisions about whether to challenge discrimination are based on a balancing of the costs and benefits of reporting. Accordingly, many federal employment statutes, including Title VII, the ADA, the ADEA, and the Fair Labor Standards Act (FLSA), provide retaliation provisions protecting employees who report violations of the statutes.

Courts have consistently recognized that the McDonnell Douglas framework may be applied to cases of retaliation, which is the case the Appellant bring before the Court. The burden shifting aspect of the framework applies to retaliation claims as it does to other employment discrimination claims. The plaintiff must first carry the burden of proving a prima facie case of retaliation to create an inference of the employer's retaliatory motive.  After the plaintiff has established a prima facie case, "the defendant can defeat it by producing evidence that the motive for firing or taking other adverse employment action against the plaintiff was not retaliatory, <u>unless the plaintiff is able to come back and show that the alleged nonretaliatory motive was actually pretextual.  De novo review of the Plaintiff's documented evidence clearly reveals that UH's alleged nonretaliatory motive is pretextual.</u>

Reasonable persons may conclude that UH's alleged non-retaliatory motive was, in fact, pretextual by examining the evidence of pretext in the actions of Ms. Danialle Lynce, the Head of Human Resources;  pretext in the blatantly false premise for luring Dundee to the HR meeting at 7:00 am, on 8/5/2016;  pretext in the demonstrably false reason for putting Dundee into corrective action, one step from termination, on 6/26/2017;  pretext in the UH Position Statement to the EEOC, with Ms. Lynce feigning ignorance of  any "protected activity," Dundee's charge of sexual harassment against his supervisor, Ms. Rachael Lerman.  This evidence was stunningly ignored by Magistrate Judge Greenberg in his Report and Recommendation.

The third element of the prima facie case in retaliation claims can be established in different ways. Initially, the plaintiff must prove that the employer had knowledge of the protected activity. See, e.g., Brower v. Runyon, 178 F.3d 1002, 1006 (8th Cir. 1999)

6

(stating that without a showing of the supervisor's knowledge of the protected activity, no causal connection exists).  The Sixth Circuit actually includes the defendant's knowledge as a fourth element of the prima facie case, but the other circuits find the defendant's knowledge to be inherent in the "causal link" element. Bukta v. J.C. Penney Co., Inc., 359 F. Supp. 2d 649, 671 (N.D. Ohio 2004).

To show that the employer was aware of the plaintiff's protected activity, some courts focus on the temporal proximity of the timing of the adverse employment action and the plaintiff's protected activity. Gorman-Bakos v. Cornell Co-op Extension, 252 F.3d 545, 555 (2d Cir. 2001) (holding that five months was not too long a time period to support an inference of causation).

Other courts find that timing, by itself, is not enough to prove that the plaintiff's protected activity was the reason for the defendant's adverse action. See, e.g., Hughes v. Derwinski, 967 F.2d 1168, 1174–75 (7th Cir. 1992) ("[Timing], standing by itself, does not sufficiently raise the inference that Hughes's filing was the reason for the adverse action.")  Then, conversely, timing does not sufficiently raise the inference that the employer's reason for the adverse action was not retaliation against a protected activity and yet Magistrate Judge Greenberg uses timing as a primary reason for disqualifying the Plaintiff's charge.

## The Standard in Retaliation Lawsuits

A plaintiff suing under Title VII's *anti-retaliation* provision must demonstrate that the adverse employment action "might well dissuade a reasonable worker from making or supporting a charge of discrimination." The definition of adverse employment action

under a Title VII retaliation claim is less demanding (and thus easier to meet for

employees) than a claim of discrimination.

This is the main point of law missed entirely by the Federal Court Northern District

of Ohio, by Magistrate Judge Goldberg and Judge Polster; as the Sixth Circuit reaffirmed

in *In Hubbell v. Fedex Smartpost*, Inc., ___ F.3d ___; 2019 WL 354786 (Aug. 5, 2019):

The definition of a "materially adverse action" differs between claims of retaliation and

claims of discrimination.

A discrimination claim definition of materially adverse action is one that substantially

affects the terms and conditions of employment.  A retaliation claim definition of a

materially adverse action is an action that might well have dissuaded a reasonable worker

from making or supporting a charge of discrimination.  This can include things like being

ostracized, subject to increased scrutiny, etc.  The showing required for a Title VII

retaliation claim is thus less burdensome than what a plaintiff must demonstrate for a

Title VII discrimination claim.  Retaliation includes any employer action that is

"materially adverse." <u>This means any action that *might deter a reasonable person from*</u>

<u>*engaging in protected activity.*</u>

"Materially adverse" actions include more than employment actions such as denial of

promotion, non-hire, denial of job benefits, demotion, suspension, discharge, or other

actions that can be challenged directly as employment discrimination. Magistrate

Greenberg ignored the fact that retaliation can be an employer action that is work-related,

or one that has no tangible effect on employment, or even an action that takes place

exclusively outside of work, as long as it may well dissuade a reasonable person from

8

engaging in protected activity, such as work-related threats, warnings, increased scrutiny

without justification or reprimands.

Defendant Danialle Lynce, in the HR meeting on 8/5/2016, threatened the Plaintiff

with increased scrutiny and termination, despite the fact that Lynce, herself, was violating

hospital policy by using the Plaintiff's addendums to past corrective actions in her

threats, such addendums being allowed under UH policy.


### Threats, Duress and the Law

What does it mean to make a threat, and under what circumstances can a speaker be

convicted for making one?  In June 2015, the Supreme Court decided Elonis v. United

States, a much-anticipated case that concerns the crime of making a threat. The Court

held that although the text of 18 U.S.C. § 875(c) does not expressly contain a mens rea

requirement, a speaker may be convicted when she "transmits a communication for the

purpose of issuing a threat, or with the knowledge that the communication will be viewed

as a threat" and not when she conveys a statement that may objectively be a threat but not

subjectively intended as such.

As the court in *United States v. Darby* held, a person violates Section 875(c) if the

person intentionally makes a statement that a reasonable person would perceive as

threatening, even if the speaker intended simply to make a crude joke. Just as it is

irrelevant whether a speaker carries out his threatening remarks, it also is irrelevant

whether he intended his words to serve as a threat. Making a threat, therefore, essentially

becomes a crime of negligence, because the focus is on how a reasonable person would

perceive the communication.

Defendant Danialle Lynce's sole reason for calling the pretextual meeting of 8/5/2016 was to transmit a communication for the purpose of issuing a threat of increase scrutiny leading to termination, to the Plaintiff Dundee, with the full knowledge that the communication would be viewed as a threat.  Ms. Lynce's threats, though not criminal in nature, share the same characteristics of a criminal threat.

In the case of Ms. Lynce's threats, the wrongdoing she caused was the real, tangible harm that follows after making a threat; the threat caused fear and all its attendant damaging and disruptive psychological, emotional, and physical effects, not only to Dundee, but to his wife and two sons, as well.  Ms.  Lynce's threats, by their very utterance inflicted injury because they created a sense of fear that disturbed the entire family's sense of security.

Magistrate Judge Greenberg, in his Report and Recommendation, considered Ms. Lynce's threats of 8/5/2016 as insignificant, if he considered them at all.  Magistrate Judge Greenberg viewed the threats as being a onetime injury or harassment, beginning and ending on 8/5/2016, wholly contained to that date.  In this way, Magistrate Judge Greenberg erred by dismissing the direct causal connection between Ms. Lynce's threats issued on 8/5/2016 and Ms. Lynce's pretextual, final step corrective action on 6/26/2017.

Threats issued by Ms. Lynce on 8/5/2016 were not wholly contained on that date, but were on a continuum, felt by the Plaintiff Dundee every day after 8/5/2016 until Ms. Lynce followed through with her threat on 6/26/2017, bestowing the timely, causal connection critical to proving the Plaintiff's charge retaliation under Title VII. The Second Circuit reversed the lower court's decision that a threat of termination was not an "adverse employment action" in a retaliation claim.  The issue arose from multiple

claims of racially motivated harassment by an employee that were allegedly met with various forms of retaliation, including: threats of termination, further harassment and discipline. The district court held that this was not a materially adverse employment action, as required by Title VII's anti-retaliation provision.  The Second Circuit reversed, holding that the threats could dissuade a reasonable employee from making a charge of discrimination as required for the retaliation claims.  *Rivera v. Rochester Genesee Regional Transportation Authority,* No. 11-762-cv (2d Cir. Dec. 21, 2012).

The collateral damage from Ms. Lynce's attempt to intimidate the Plaintiff using threats also serves to intimidate EVERY other UH employee from exercising their legal right to work without harassment.  Once she issued the threat, every future adverse action taken against the Plaintiff, in which D. Lynce had ANY involvement, connected that adverse action to the threat she issued on 8/5/16, regardless of the time that elapsed between the filing of sexual harassment charges on 6/26/16.

There is no expiration date on a threat; the Plaintiff was placed on official notice that even if he followed UH policy, the head of HR promised he would be terminated.  Any reasonable person would conclude that this created a hostile and intimidating work environment for the Plaintiff, forcing him to work under the pressure of duress until he either resigned or was terminated.

A constructive discharge is a way for an employer to force an employee to quit without officially terminating her. It involves creating circumstances in the workplace that would force any reasonable person to resign. This may involve scheduling an employee to work inconvenient hours or asking her to perform the least desirable work. It can also force the employee to resign from the humiliation of being mandated into

11

mental health counseling.  This creates a stressful environment for her, leading her to quit. When officially terminated, a disgruntled employee may file a lawsuit against an employer seeking financial damages. An employee who quit on her own will is less likely to sue an employer.

Duress is "[a]ny coercion of another, either mental, physical, or otherwise, causing him to act contrary to his own free will or to submit to a situation or conditions against his own volition or interests." *Mitchell v. C.C. Sanitation Co.*  Although the employer had a right to discharge Mitchell at any time, it was duress for the employer to threaten to do so because of the "advantage taken of the weaker party."  An ordered society should punish instances where one person, for example, the Plaintiff, is unduly made to feel afraid of physical or psychological abuse by another.

Courts have even allowed for claims of duress when the employer never expressly threatened to terminate an employee if the threat was implicit in the employer's demands. *Pietrylo v. Hillstone Rest. Grp.*, No. 06-5754, 2008 WL 6085437,  (D.N.J. July 24, 2008). Consequently, employers need not expressly state, "do this or you will be fired" in order for the employee to bring a duress claim, provided that the employer implies, through words or actions, that termination will occur if the employee is noncompliant.

Common sense informs us that a threat of increased surveillance with the purpose to find a reason, any reason, to terminate an employee, causes duress and would dissuade a reasonable person from engaging in a protected activity; the threat of termination, itself is a materially adverse action.

**Application of the Seven-Factor Test to Facts of Kroll's Case**

Magistrate Judge Greenberg, who accused the Plaintiff of misunderstanding the role of the EAP, himself misunderstood the role of the EAP, which provides mental health services and evaluations delivered by licensed therapists and mental health care professionals. The Magistrate ignored the fact that mandatory EAP sessions are legally considered "medical examinations" by the Court under Kroll vs White Lake Ambulance.

The Sixth Circuit Court holding that Kroll presented sufficient evidence from which a jury could conclude that the psychological counseling WLAA required Kroll to receive constitutes a "medical examination" under 42 U.S.C. § 12112(d)(4). Kroll, 691 F.3d at 819-20. The Sixth Circuit therefore remanded the case to this Court for further proceedings

The EEOC defines "medical examination" as a procedure or test that seeks information about an individual's physical or mental impairments or health." Moreover, the EEOC provides a seven-factor test, which may be used by a court in order to determine whether an examination, inquiry, or procedure qualifies as a "medical examination." The EEOC is careful to note that by finding even one factor, a court may find that the fact at issue is "medical examination."

De novo review will reveal that the Plaintiff's charge met multiple factors in the seven-factor test. A reasonable jury may find these factors weighed in favor of a finding that Dundee was instructed to attend a "medical examination." In examining the first factor, a reasonable jury may find the evidence is clear that UH mandated Dundee to attend a medical examination administered by certified EAP counselors and a psychiatrist, both mental health professionals. A reasonable jury may find the second

factor was satisfied because the EAP counselors, in listening to Dundee, would have to engage in some "interpretation" in order to assist him.

A reasonable jury may conclude that the psychological counseling was designed to reveal a mental health impairment, since that is the primary role of counseling in an Employee Assistance Program.  In any Google search for "EAP" the immediate description contains words to the effect that "*An employee assistance program (EAP), if offered by your company, provides a fantastic mental health release valve within the organization. Employees get just-in-time mental health support for personal or work-related issues. The firm benefits by supporting staff with free, confidential counseling, assessments, and family support. That results in a mentally healthy culture with optimized employee productivity.*"

In addition, any Google search will reveal that EAP's are underutilized because employees are put-off by the mental health stigma associated with the program: "*For both employers and EAPs, addressing the impact of stigma and perceptions of mental illness is costly, requiring greater direct employee engagement and education. However, it is a more effective means of increasing EAP use than current practices and, ultimately, can result in significantly higher net gains in productivity while reducing employers' direct costs.*"

A reasonable person would be correct in assuming that the primary role of the EAP is to provide mental health related services.  Therefore, a reasonable person would be correct in concluding that a fellow employee remanded into the EAP was referred in order to receive mental health counseling.  A reasonable person, such as a juror, would also be correct in concluding that the UH manager(s) who remanded the Plaintiff into

14

EAP counseling sessions, REGARDED THE PLAINTIFF as having a mental health problem, mandating mental health counseling, which violates Title I of the ADA for perceived disability.

Magistrate Judge Greenberg and the Defense readily admitted that not one aspect changed in the Plaintiff's job position as a clinical pharmacist, before, during or after mandatory EAP counseling; thus the mandatory medical examination in the EAP was NOT business related nor made from business necessity.  The Plaintiff continued to provide the same pharmacy service after being mandated into the EAP medical examination as he has provided in the previous seven years at UH Geauga Medical Center.

### Conclusion: "No brilliance is needed in the law, nothing but common sense and relatively clean fingernails."  John Mortimer

In the digital era, news moves at the speed of chaos. As a result, workers' concentration is atomized to the point of nothingness, their ability to pay attention fractured like china. Employer practices which should absolutely stop the presses, that which should grab employees and the Court by the shoulders and shake them like rag dolls, that which should count as a four-alarm fire for workplace discrimination, has all the staying power of soap bubbles and dew.

But there is something to be said for the refusal to acquiesce when the cause is righteous. And this case before the Court is righteous. Employers, often with complicity from the Court, claim nothing less than the power to reject the will of Congress, in Title VII and the ADA, which is the will of the people. To accept that is to accept not just the

theft of the workers' rights, but the death of the workers' rights — the irrevocability of their collapse. There is a fire in the house of democracy and in the workplace. Let no one adapt to that.

It is the prayer of the Appellant that justice will be served by de novo review in the Sixth Circuit Court of Appeals, in order to reverse the verdict of Judge Aaron Polster of the Federal Court of Northern Ohio, and finding in favor of the Plaintiff on all three violations that University Hospitals committed against the Plaintiff  [Title VII, for retaliation against a protected activity; Title I of the ADA for unlawful medical examination; Title I of the ADA for perceived disability].

I certify that a copy of this brief was sent to opposing counsel via U.S. Mail on the 29th day of October, 2020.

Signature (Notary not required)

*Frank Dominic Dundee*

Frank Dominic Dundee, Pro Se Litigant

fdundee@gmail.com

330-398-8274

16