<u>NOT RECOMMENDED FOR PUBLICATION</u>

No. 20-3836

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| FRANK DOMINIC DUNDEE, | ) | **FILED**<br>Feb 25, 2021<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| DANIALLE LYNCE, Director of Human | ) | OHIO |
| Resources; et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

O R D E R

Before:  DAUGHTREY, McKEAGUE, and THAPAR, Circuit Judges.

Frank Dominic Dundee, proceeding pro se, appeals the district court's judgment in favor of the defendants in his employment discrimination action, brought pursuant to Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e–2000e-17, and the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101–12213.  This case has been referred to a panel of the court that, upon examination, unanimously agrees that oral argument is not needed.  *See* Fed. R. App. P. 34(a).

In 2010, Dundee was hired as a third-shift pharmacist at Geauga Medical Center, part of the University Hospitals Health System (University Hospitals).  From 2013 to February 2018, Rachael Lerman supervised Dundee.  Evidence in the record shows that, between 2013 and 2016, Lerman disciplined Dundee for non-compliance with the department's attendance and other policies and noted areas for improvement in his performance evaluations, including the need for better communication with management and co-workers.  In each instance of discipline or criticism, Dundee responded with claims or complaints of discrimination and harassment.  On one

occasion Dundee filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC).

In 2016, Dundee began having problems with his attendance again. After 20 unauthorized tardies between January and April of that year, Lerman placed Dundee on a second Performance Improvement Plan on May 3, 2016. Also, at that time, Lerman began receiving an increased number of complaints about Dundee's unprofessional conduct. Pharmacy employees had complained of Dundee's "brusque demeanor" and of feeling "threatened" and "bullied" by him. For example, a May 1, 2016, email from a pharmacy technician to his manager complained of Dundee's lack of patience and "angry personality," reporting that Dundee "will yell and scream uncontrollably" and that he "repeatedly crosses the line." As a result of these complaints, Lerman issued a Corrective Action to Dundee on June 14, 2016. She noted specific problems reported by other employees, including "yelling at people, notes left in the workplace, rudeness, and a hostile attitude." As she had done before, Lerman suggested that Dundee contact the Employee Assistance Program (EAP) for support.

Dundee appealed the Corrective Action through a Complaint Resolution Statement Form. He accused Lerman of "harassing and hostile behavior" that he "directly attribute[d] . . . to age discrimination." He also asserted that "there may . . . be a component of sexual harassment as a contributing factor" that he had not mentioned previously "for fear of retaliation." On June 26, 2016, Dundee submitted an internal complaint expanding on his claims of sexual harassment. He stated that, on at least three occasions between the spring of 2012 and October 2013, he "was subjected to unwelcome sexual harassment in the form of unwelcome sexual advances" by Lerman. On August 3, 2016, Human Resources Business Partner Danialle Lynce emailed Dundee to inform him that, after an investigation, she and Compliance Manager Ed Soyka could not substantiate his allegations of sexual harassment.

On August 5, 2016, Lynce met with Dundee and University Hospitals Director of Pharmacy Jason Glowczewski to discuss Dundee's "continuing inappropriate conduct at work" and the results of the investigation of his complaint against Lerman. Lynce and Glowczewski

reviewed with Dundee numerous unprofessional and inappropriate comments he had made to and about his colleagues and advised him that such statements violate University Hospitals' professional behavior policy and that continuing to make such statements could result in corrective action up to and including termination.

Throughout 2017, Lerman continued to receive complaints from other employees about Dundee's inappropriate behavior at work. After consulting with Lynce, Lerman issued another Corrective Action to Dundee and made a "mandatory Tier 2 referral" to the EAP. Lerman explained to Dundee, "In a series of recent emails, you've made inappropriate comments that undermine the professionalism of fellow coworkers and are inconsistent with our value of Diversity and the expectations set forth in HR-63 Professional Behavior policy and our Code of Conduct." In his response, Dundee asserted that the Corrective Action was part of a pattern of retaliation that began at the August 5, 2016, meeting with Lynce and Glowczewski for his having made a sexual harassment complaint against Lerman.

On July 26, 2017, Dundee met with David J. Riccardi, a counselor with the University Hospitals' EAP. At the end of the session, Riccardi suggested that Dundee attend a psychiatric evaluation and presented him with medical releases and a "Compliance Contract." Dundee never submitted to a psychiatric evaluation, and University Hospitals neither has forced him to do so nor taken any action against him for refusing to do so. Dundee also never signed a medical release, and University Hospitals has taken no action against him as a result. In January 2018, Dundee met with Jill Fulton, an Employee Assistance Manager and counselor with the EAP, for a follow-up counseling session. Dundee remained employed in the same position with University Hospitals at the same rate of pay, with regular increases consistent with University Hospitals policy, until he ended his employment with University Hospitals in 2020 for reasons unrelated to this litigation.

In September 2017 and April 2018, Dundee filed charges with the EEOC and the Ohio Civil Rights Commission, alleging retaliation and discrimination on the basis of disability. In May 2019, Dundee filed a pro se employment discrimination complaint in the district court against University Hospitals, Lynce, Glowczewski, Lerman, and Shawn Osborne, the Vice President of

Supply Chain and Pharmacy Services for University Hospitals. Dundee raised three claims for relief: (1) retaliation for having filed a complaint of sexual harassment, in violation of Title VII; (2) requiring medical examinations, in violation of Title I of the ADA; and (3) discrimination and harassment on the basis of what the defendants perceived to be his disability, in violation of the ADA. Dundee sought declaratory and injunctive relief as well as compensatory and punitive damages.

The individual defendants filed a motion to dismiss on the ground that there is no individual liability under Title VII or the ADA, and University Hospitals filed a motion for judgment on the pleadings, arguing that Dundee's claims were time-barred. A magistrate judge issued a report recommending that the motions be granted, and Dundee filed no objections. The district court granted the individual defendants' motion to dismiss and granted University Hospitals' motion for judgment on the pleadings, in part, allowing only those claims based on events that occurred after September 13, 2016, to go forward.

Dundee and University Hospitals then filed cross-motions for summary judgment. A magistrate judge issued a report recommending that Dundee's motion be denied and that University Hospitals' motion be granted as to all claims. Over Dundee's objections, the district court adopted the magistrate judge's report and recommendation, denied Dundee's motion for summary judgment, and granted summary judgment in favor of University Hospitals. Dundee now appeals, simply referring in his brief to the objections he filed in response to the magistrate judge's report and recommendation.

As an initial matter, to the extent Dundee appeals the district court's order dismissing his claims against the individual defendants and any claims based on events that took place before September 13, 2016, he has waived any challenge to such order by his failure to object to the magistrate judge's report and recommendation despite having been advised to do so. *See Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985). Although exceptional circumstances may warrant departure from the waiver rule in the interests of justice, *see Thomas*, 474 U.S. at 155; *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452,

458 (6th Cir. 2012), none is present in this case.  Indeed, in his appellate brief, Dundee provides no explanation for his failure to object nor does he make any arguments challenging the district court's order.

Dundee also has forfeited his appeal of the district court's judgment by failing to specify issues for appeal in his appellate brief and only incorporating by reference his objections to the magistrate judge's report and recommendation.  Although filings by pro se litigants "must be held to 'less stringent standards than [filings] drafted by lawyers,'" *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)), we have held that "on appeal, parties may not . . . 'incorporat[e] by reference . . . arguments made at various stages of the proceeding in the district court.'"  *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 960 F.3d 785, 810–11 (6th Cir. 2020) (quoting *Northland Ins. v. Stewart Title Guar. Co.*, 327 F.3d 448, 452 (6th Cir. 2003)), *pet. for cert. filed*, No. 20-601 (U.S. Oct. 30, 2020).  But even if Dundee had not forfeited his claims on appeal, we would affirm the district court's judgment on the merits for the reasons set forth below.

We review a district court's grant of summary judgment de novo, viewing the facts in the light most favorable to the non-moving party.  *Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## I.   *Retaliation*

Title VII protects an employee against retaliation for engaging in protected conduct.  Because Dundee offered no direct evidence of retaliation, the district court properly considered his claim under the *McDonnell Douglas* burden-shifting framework.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  Under that framework, a plaintiff has the initial burden of establishing a prima facie case of retaliation by showing that:

> (1) []he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive

retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (emphases omitted).  After the employee sets forth a prima facie case, the employer must articulate a legitimate, non-retaliatory reason for the adverse employment action, to which the employee must respond with evidence of pretext.  *See Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).

A.    *Adverse Employment Action*

Before the district court, University Hospitals did not dispute that Dundee engaged in protected activity that was known to University Hospitals.  Thus, the magistrate judge focused on whether Dundee suffered an adverse employment action and whether there was any causal connection between such an adverse action and the protected activity at issue.  In first finding that Dundee suffered no adverse employment action, the magistrate judge focused on two discrete incidents—Dundee's August 2016 meeting with Lynce and Glowczewski and the June 2017 Corrective Action issued by Lerman.  The magistrate judge reasoned that neither a threat of termination nor a promise of increased scrutiny at work amounts to adverse employment actions.  To reach this conclusion, the magistrate judge relied on this standard:  "a plaintiff must designate evidence showing that, as a result of a decision by the defendant, he suffered 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  But this standard applies to a claim under Title VII's substantive anti-discrimination provision, not to a retaliation claim.  In *Burlington Northern & Santa Fe Railway Company v. White*, 548 U.S. 53, 67 (2006), the Supreme Court explained that "Title VII's substantive provision and its antiretaliation provision are not coterminous."  The Court held that to satisfy the adverse action prong of a prima facie case in the retaliation context, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'"  *Id.* at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

Under this standard, the August 2016 meeting does not amount to an adverse employment action.  In describing the materially adverse standard in the retaliation context, the Supreme Court emphasized that it "refer[red] to reactions of a *reasonable* employee because . . . the provision's standard for judging harm must be objective."  *Id.*  It further explained, "We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters."  *Id.* at 69.

Considering the context and circumstances under which the August 2016 meeting took place, it would not have dissuaded a reasonable employee from making a complaint of discrimination.  In his complaint, Dundee painted a picture of Lynce and Glowczewski receiving his complaint of sexual harassment and then poring over his personnel file in order to find ammunition that would allow them to threaten him with termination at the August 5, 2016, meeting.  He alleged, "Lynce, against [University Hospitals] Policy . . . rifled his personnel file, quoting documents from various files piled high on her desk; using sentences, taken out of context, from explanatory addendums the Plaintiff had written as attachments to disciplines and sub-standard performance reviews.  She used the material to threaten the Plaintiff with termination if he ever expressed such sentiments in the future."  What he failed to mention, however, is the discipline that had been imposed just prior to the August meeting, *i.e.*, the May 2016 Performance Improvement Plan to address Dundee's issues with tardiness and the June 14, 2016, Corrective Action that Lerman issued in response to complaints from Dundee's co-workers about his unprofessional behavior and hostile treatment of them.  Nor did he mention that his complaint of sexual harassment came only one day after receiving the Corrective Action.  In their affidavits, Lynce and Glowczewski explained that they met with Dundee on August 5, 2016, "to discuss Mr. Dundee's continuing inappropriate conduct at work and the results of University Hospital's investigation of his sexual harassment complaint against Ms. Lerman."  Lynce stated, "The purpose of the meeting was not to threaten Mr. Dundee, but to counsel him that, if he continued to engage in inappropriate and unprofessional behavior at work, his employment could be terminated."  Contrary to Dundee's version of events, the unprofessional behavior addressed at the

meeting did not come out of thin air. It occurred in the months leading up to the meeting and was part of a documented pattern of behavior dating back to 2013. Under these circumstances, the warning from Lynce and Glowczewski that continued unprofessional conduct and mistreatment of coworkers could result in further discipline, including termination, would not dissuade a reasonable employee from bringing a charge of discrimination.

Although not addressed by the magistrate judge, Dundee framed his retaliation claim as one of retaliatory harassment, alleging that the August 2016 meeting was "the start of the severe revenge Ms. Lynce promised in opposition to the legal protections for his charge of 6/26/16," that he has been subjected to a "pattern of pretextual attacks," and that since the August 2016 meeting he has had to work in a hostile work environment consisting of a "constant threat of termination through pretextual corrective actions, increased scrutiny and surveillance." He argues that he "suffered an 'adverse employment action' having to endure a hostile work environment."

In order to establish retaliatory harassment, a plaintiff must satisfy both an objective and a subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)). Dundee pointed to only two incidents, asserting, "The threats issued on 8/25/2016 serve as a bridge connecting the materially adverse action of 6/26/2017 to the protected activity of 6/26/2016, one year to the day earlier." He offered no evidence of harassment that he suffered at any point between the August 2016 meeting and the June 2017 Corrective Action, however. Dundee claimed that he was under "increased scrutiny and surveillance" during this time, but there is no evidence in the record to support his assertion. One counseling session and one Corrective Action over the period of nearly one year does not amount to "severe and pervasive" conduct that would rise to the level of retaliatory harassment.

The only action taken by University Hospitals that arguably could be deemed materially adverse for purposes of a retaliation claim is the June 2017 Corrective Action and mandatory

referral to the EAP. But for the reasons set forth below, even assuming that such action does satisfy the third prong of a prima facie case of retaliation, Dundee failed to create a genuine issue of material fact as to whether such action was causally connected to his sexual harassment complaint.

### B.     *Causal Connection*

"To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that h[is] protected activity was the likely reason for the adverse action." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (citations and internal quotation marks omitted). "[P]roximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection." *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (citation omitted).

The magistrate judge properly concluded that Dundee failed to establish a causal connection between his sexual harassment complaint and the June 2017 Corrective Action to establish a prima facie case of retaliation. Dundee relied on the temporal proximity of his complaint and the August 2016 meeting, arguing that the meeting served as the "bridge" between his protected activity and the Corrective Action. But he offered no evidence to show that the June 2017 Corrective Action was connected in any way to the August 2016 meeting. And the one-year gap between Dundee's sexual harassment complaint and the June 2017 Corrective Action is simply too long of a time period for temporal proximity alone to support an inference of retaliation. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000) ("cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months") (citation omitted). Moreover, the record included substantial evidence to show that Lerman had a non-retaliatory basis for issuing the Corrective Action and a mandatory referral to the EAP in June 2017. Because Dundee failed to raise a genuine issue of material fact with respect to the third and fourth elements of his prima facie case, the district court appropriately granted summary judgment to University Hospitals on Dundee's claim of retaliation under Title VII.

## II.    *ADA—Medical Examination*

Dundee claimed that the mandatory referral to the EAP counseling, which included a "mandatory psychiatric examination," violated the ADA.  The ADA prohibits an employer from "requir[ing] a medical examination" or "mak[ing] inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).  Accordingly, "any examination ordered by the employer must be restricted to discovering whether the employee can continue to fulfill the essential functions of the job." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811-12 (6th Cir. 1999).

In *Kroll v. White Lake Ambulance Authority*, 691 F.3d 809 (6th Cir. 2012), we considered what constitutes a medical examination.  To interpret the meaning of "medical examination" as used in the statute, we looked to the EEOC Enforcement Guidance, which defines the term as "a procedure or test that seeks information about an individual's physical or mental impairments or health."  *Id.* at 815 (quoting EEOC, *Enforcement Guidance: Disability–Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)*, Part B.2, *available    at*    https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees).  The guidance sets forth a seven-factor test to use when analyzing whether a test or procedure "is likely to elicit information about a disability":

(1) whether the test is administered by a health care professional;

(2) whether the test is interpreted by a health care professional;

(3) whether the test is designed to reveal an impairment or physical or mental health;

(4) whether the test is invasive;

(5) whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task;

(6) whether the test normally is given in a medical setting; and,

(7) whether medical equipment is used.

*Id.* at 816 (quoting EEOC, *Enforcement Guidance: Disability–Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)*, Part B.2). The guidance notes that the presence of one factor may be enough to determine that a procedure is medical and includes "psychological tests that are designed to identify a mental disorder or impairment" as an example of a medical examination. *Id.* (quoting EEOC, *Enforcement Guidance: Disability–Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)*, Part B.2). Although not dispositive of whether a procedure is considered a medical examination, "the employer's purpose must be considered in the larger factual context of a particular test or assessment's typical uses and purposes." *Id.*

The magistrate judge properly concluded that the referral of Dundee to the EAP did not amount to a "medical examination" within the meaning of the ADA. The referral was intended to "provide support to . . . Dundee in an effort to enable him to improve his conflictive work relationships and inappropriate conduct at work." In her affidavit, Lynce explained that, pursuant to University Hospitals' policy, a Tier 2 mandatory referral to the EAP occurs when "an employee is referred by his supervisor for . . . conflictive work relationships . . . that ha[ve] not been corrected despite counseling by the supervisor." She further explained that "Tier 2 referrals . . . do not begin with a medical examination" and that "[p]rior to making a Tier 2 EAP referral, no University Hospitals supervisor is required to make a medical diagnosis or even suspect that an employee may be disabled." Both counselors that met with Dundee affirmed that their sessions involved only discussion of the matters surrounding his Corrective Action and his claims against Lerman and Lynce and that they performed no tests or procedures, used no medical equipment, and made no diagnoses. Both stated that no one ever told them that "Dundee had a mental disability or that they suspected or perceived that . . . Dundee was mentally disabled." Utilizing the seven-factor test set forth in the EEOC Guidance, we cannot conclude that either counseling session could be considered a medical examination.

At the end of the counseling session, Riccardi "*recommended* that [Dundee] attend a psychiatric evaluation." (emphasis added). Dundee pointed out and University Hospitals

acknowledged, however, that Riccardi presented Dundee with a "Compliance Contract," requiring Dundee to "attend evaluation with [a psychologist,] follow recommendations [and] [f]ollow up with EAP as scheduled."  But no such psychological evaluation was ever done.  Indeed, when Dundee objected to that recommendation, University Hospitals did not pursue the matter and took no action against Dundee.  Thus, although such evaluation could have been considered a "medical examination" within the meaning of the ADA, University Hospitals never "require[d]" Dundee to undergo the evaluation and never took any adverse action against him for failing to comply.  42 U.S.C. § 12112(d)(4).  Because Dundee failed to raise a genuine issue of material fact as to whether University Hospitals required that he undergo a medical examination, the district court properly granted summary judgment to University Hospitals on this claim.

## III.    *Disability Discrimination*

An essential element of a prima facie case of disability discrimination under the ADA is that the plaintiff is disabled.  *See Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012).  Under the ADA, the term "disability" means:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

> (B) a record of such an impairment; or

> (C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1).  Dundee alleged that University Hospitals discriminated against him on the basis of a perceived mental impairment.  University Hospitals, however, provided testimony from Lerman, Lynce, Riccardi, and Fulton that they did not perceive Dundee as suffering from any mental impairment and that no one ever told them that he had a mental disability or that a mental impairment was suspected.  Dundee offered no evidence to refute this testimony or to show that any other University Hospitals employee regarded him as disabled.  The district court therefore properly granted summary judgment to University Hospitals on this claim.

No. 20-3836
- 13 -

Accordingly, for the foregoing reasons, we **AFFIRM** the district court's judgment.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk